LYNN C. HARRIS (1382)
ATTORNEY AT LAW
Jamestown Square, Ste. 200
3325 No. University Ave.
Provo, Utah 84604
Telephone: 801-375-9801
lharris@lynnharrislaw.com

G. ERIC NIELSON
TODD WAHLQUIST
G. Eric Nielson & Associates
Todd Wahlquist
4790 S. Holladay Blvd
Salt Lake City, UT 84117
ericnielson@ericnielson.com
toddwahlquist@ericnielson.com

*Attorney for Plaintiff*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH CENTRAL DIVISION

| | | |
|---|---|---|
| JENNIFER GUILLEN ZAVALA AND HUGO DOMINGO OLIVERA, INDIVIDUALLY AND AS THE PARENTS AND NATURAL GUARDIANS OF JDO, A MINOR CHILD; AND JDO A MINOR CHILD, | : : : : : : : | COMPLAINT |
| Plaintiffs, | : : | |
| vs. | : : | |
| THE UNITED STATES OF AMERICA; AND THE US DEPARTMENT OF HEALTH AND HUMAN SERVICES, | : : : : : | Case No.: 2:22-cv-00422 |
| Defendants, | : | JUDGE: Magistrate Judge Dustin B Pead |

COMES NOW the above-named Plaintiffs, by and through counsel, and for cause of action allege as follows:

## I.  PARTIES AND JURISDICTION

1. At all times relevant to this action the Plaintiffs were residents of Salt Lake City, Utah in Salt Lake County.

2. A Federal Notice of Claim under the Federal Torts Claims Act was filed by the above-named Plaintiffs on May 10, 2021, against as follows: (1) the United States; (2) US Department of Health and Human Services; (3) Community Health Center Inc. [CHC], a health center program under 42 USC 254(b), deemed Public Health Service employees under 42 USC 233 (g-n), and is located at 461 S 400 E, Salt Lake City, Utah 84111.

3. Following service of the Federal Notice of Claim the Plaintiffs have not received notice that the claim has been denied, and as the statutory time has passed for the United States and HHS to respond, the Plaintiffs consider their claim to be denied.

4. Upon information and belief, the providers at Community Health Center, Inc., are employees of the United States of America, having received federal funding as a community health center, pursuant to 42USC 245(b).

5. The above described CHC is also a Utah Corporation, and thus a Notice of Intent to Commence Action under UCA 78B-3-401 was filed under the Utah State DOPL process. The DOPL process was concluded with a certificate of compliance issued by DOPL on September 21, 2021.

5. This civil action is filed in the United States District Court as this Court has the exclusive jurisdiction over all claims commenced against the United States, US Department of Health and Human Services, and the CHC a Federal Health Center Program under 42 USC 254(b) and the CHC employees are deemed to be Public Health Service employees under 42 USC 233 (g-n).

6. The Plaintiffs assert that venue in the above District Court is proper as the Community Health Center, Inc., is located in Salt Lake City, Utah.

7. As this medical malpractice case involves care rendered to the Plaintiffs at the Utah State owned and operated University of Utah Health Sciences Care and the University of Utah Medical Center [UUMC] a civil action has been previously commenced and filed in the State of Utah's Third District Court as Civil Number 210905749. That action is pending and is involved in ongoing discovery.

On March 17, 2022, the Defendants in the State civil action filed a formal Notice of Intent to Apportion Fault at trial "to the medical care providers employed by Community Health Care Clinic in Salt Lake City, Utah."

**FACTS AND CIRCUMSTANCES**

8. Plaintiffs submit that the general nature of their claims are based on obstetrical, medical, and nursing malpractice during the labor and delivery process of Jennifer Guillen Zavala and the delivery of JDO, a minor child, on June 12-13, 2020, in the above noted University of Utah/UU Hospitals and Clinics' Obstetrical Floor and Department.

3

9. Summary of Events and facts and circumstances:

a. Jennifer Guillen Zavala [hereinafter Jennifer] had been receiving her pre-natal care at the Community Health Care Clinic near her home in Salt Lake City. Her pre-natal course had been normal and routine and without any problems. Jennifer's 'due date' was 6/12/2020.

b. On June 12, 2020, Jennifer awoke and began to have contractions at 8:30 am. During the morning, her contractions continued, and she and Hugo left for the UUMC at around noon. While driving to the UUMC, Jennifer's water broke at approximately 12:30 pm.

c. Upon arrival at the UUMC, she was admitted to the OB Emergency Department and after some initial tests and a cervical exam she was informed that she was in labor. She was then transferred to the Labor and Delivery Department.

d. She was initially 'admitted' under the care of a CHC family practice physician. She was thereafter followed and cared for over the course of her labor and up to the time of the delivery, by both the members of the UUMC OB department's nursing staff, medical staff physicians and residents, and by a second CHC family practice physician, Zoe Cross MD.

e. She was admitted to UUMC in the labor and delivery area and the labor and delivery-nursing and medical care was commenced at 13:23 on 6/12/20.

f. At approximately 14:18 an ultra-sound was performed to establish 'presentation' and it was determined that the presentation was cephalic.

g. The L & D's Admission notes diagnoses was 'amniotic fluid leaking' and Normal labor and delivery. In her review of systems, it was noted that: fetal movement was present; contractions present with frequency at 'q 6-10 now q 5 and uterine contractions were regular and every 3-4 minutes; leaking present; clear fluid; vaginal bleeding present; EFW by Leopold was 6.5 lb.; baseline FHR @ 150; dilatation @2; effacement @ 60%; -3 station.

h. At the time of admission, the fetal heart monitor reflected that the fetus/infant was healthy and neurologically normal and neurologically intact as he and his mother began the labor and delivery process.

i. Cervical exam at 14:11 found; dilation at 1; effacement at 30%; position was posterior; station @ -3.

j. The physicians ordered "initiate Oxytocin for Third Stage of Labor" at 6/12 @ 21:36. The initial dose was at 4mu - with an order to titrate to high dose protocol.

k.  The Pitocin was continued to be increased by the nurses and per the physician's order over the remaining duration of the labor and delivery as follows:

21:51 @ 4mu

22:33 @ 6 mu

23:26 @ 8 mu

00:16 @ 6 mu

00:27 @ 4 mu

00:30 @ 0 mu

01:15 @ 1 mu

02:07 @ 2 mu

09:50 @ 0 mu

10:33 @ 1 mu

11:06 @ 2 mu

12:40 @ 3 mu

13:55 @ 0 mu

14:24 @1 mu

15:13 @ 2 mu

16:18 @ 3 mu

16:46 @ 5 mu

17:17 @  7 mu

17:50  29 hours after Jennifer's water broke
        Dilation 10 – 100% effacement - +2 station –

       LOT position

18:03 @ 9 mu

18:04 @ 4 mu

19:14 @ 5 mu through to delivery

Delivery @ 20:56 – 32+ hours after Jennifer's water broke.

l.     On information and belief and as partially documented in the records, in the early and mid-afternoon on 6/13 a UUMC physician/OB resident (R4) attempted multiple manual rotations prior to Jennifer becoming complete and fully dilated. These attempts were unsuccessful and were very painful to Jennifer.

m.     On and off on 6/13 the FH Monitor revealed that the baby was struggling – with a category II tracing - resulting in the Pitocin being lowered or turned off, and the nurses turning Jennifer on her left side, during these repeated episodes in an attempt to resolve the tracing issues.

n.     At around 17:50 Jennifer became complete and one of her attending UUMC nurses stated that she would need a C-section to deliver the baby. Immediately after she was complete, she was not allowed to commence pushing – per the LD nurse – due to the position of the baby. Later at 18:06 she was asked to begin pushing by the attending physician(s). It appeared to Jennifer that the LD nurse

and the attending OB resident were in an obvious conflict as to how to proceed, i.e., with a C-section or by pushing to a vaginal delivery.

o. Jennifer was instructed to push from 18:06 and thereafter up and through the delivery at 20:56. The pushing was under the direction of both the LD nurses and the attending physician(s) over this time period.

p. It appears from the Pitocin charting that the pit dosages remained on during the entire timeframe of her pushing efforts, and during the category II periods noted on the fetal tracing, and during the time that it was obvious that this delivery was being complicated, delayed and prevented by a diagnosis of CPD.

During these pushing efforts, Jennifer was told by the physicians that the baby's head was too large to allow a vaginal delivery.

The Pitocin PDR reference states that Pitocin is not to be infused during any of the above ongoing issues with category II tracings or with a diagnosis of CPD causing an arrest of labor.

q. Over the course of Jennifer's pushing efforts more and more medical and nursing personnel were in her room and observing the delivery process. At the time of the delivery and Jennifer's final 3 pushing efforts – there were numerous physicians and nurses in attendance – apparently from a clinic 'rapid response' team of physicians and nurses.

r. Jennifer was instructed that if she didn't push out the baby with 3 more contractions/pushes - that the physicians intended to use a 'cup' to deliver the infant.

s. The UUMC delivery notes contains the following partial information:

1. Dilation @ 17:50

2. Pushing began @ 18:06

3. Shoulder dystocia noted @ 20:56:13

4. Rapid response called @ 20:56:25 by OB Shinn

5. Time providers arrived @ 20:46:47

6. Resuscitation team called for delivery due to non-reassuring fetal heart tones and maternal fever and arrived @ 20:44:33

7. Gentle attempt at traction assisted by maternal expulsive forces.

8. 'No' on forceps and 'no' on vacuum extraction

10. With pushing efforts fetus rotated spontaneously to LOA.

11. Birth time @ 20:56:58

12. Baby was sent to NICU nursery due to respiratory distress and due to the fact that the baby was delivered 'stunned' and due to 'no respiratory effort' and 'poor tone.'

13. Significant scalp swelling was noted concerning for subgaleal hemorrhage and low Apgar scores. Baby had significant

caput development from pushing and with triple I criteria and fetal tachycardia. Cat II tracing.

14. pH @ 7.317 & 7.377

15. CT showed: large bilateral subgaleal hematomas. Small amount of intraventricular hemorrhage in the occipital horn of the right lateral ventricle. No hydrocephalus. Possible tiny subdural hematoma along the falx and tentorial leaves.

16. Infant well-being: As noted in the NICU for subgaleal hematoma, IVH, SDH, abnormal neuro exam, needing respiratory support, also having seizures, getting empiric antibiotics and work up for meningitis/sepsis.

t. NICU discharge [6/30/20] diagnoses/active problems:

1. Heart murmur

2. Health care maintenance

3. Respiratory failure of newborn

4. Abnormal neurological exam

5. Intraventricular hemorrhage of newborn

6. Subdural hematoma (HCC)

7. Seizure, newborn

8. Subgaleal hemorrhage

9. "Significantly hypotonic at birth without rapid improvement during resuscitation. At 2 HOL remained without suck reflex, gag reflex, significant hypotonia, no spontaneous movements. Cord gases were venous 7.37/34/32/20/-4, and

10

arterial 7.31/40/50/18/-4. Initial baby gas 7.29/40/50/18/-7. Did not meet criteria for cooling. Began to have seizures several hours after birth. Head CT with subgaleal hemorrhage, small IVH R lateral ventricle, and tiny subdural hematoma along falx and tentorial leaves. MRI with extensive areas of cytotoxic edema.

MRI findings and infectious workup seem most consistent with HIE. Hx of delayed gag present and poor suck."

10. Assessment & Plan:
Hx: Significant scalp swelling with fluid wave and crossing suture lines after delivery; consistent with subgaleal hemorrhage. There was no instrumentation during the delivery and no significant shoulder dystocia requiring delivery maneuvers. Head CT showed bilateral subgaleal hemorrhage. PT 18/PTT 33, s/p FFP 20mL/kg x1. Hct trended for first 5 DOL and stable. Never required pRBC's.

11. MRI @ PCMC:

Impression:
1. Bilateral extensive areas of cytotoxic edema predominantly in the supratentorial compartment but also involving the cerebellar vermis.
2. Small amounts of susceptibility artifact in the dentate nuclei, likely petechial hemorrhage.
3. Hypoxic ischemic encephalopathy is the leading differential consideration. Neonatal HSV is also possibility and should be excluded. Subtle areas of leptomeningeal enhancement as above could be seen with either scenario.

u. UUMC/NICU Office visit 8/17/2020 Diagnoses :

1. Subgaleal hemorrhage

2. Abnormal neurological exam

3. Stressful life event affecting family

4. Subdural hematoma

5. Seizure newborn

6. HIE [hypoxic-ischemic encephalopathy]

## II. NEGLIGENCE OF THE CHC DEFENDANT

10. Plaintiffs hereby reference and incorporate as fully set forth herein, the allegations of paragraphs 1 through 9 above, and further alleges as follows.

11. Plaintiffs submit that the above-named CHC health care providers held themselves out to be competent and to be able to provide adequate and safe prenatal care, labor and delivery care and overall medical care and/or obstetrical services and care to their patients including mothers and infants. The Plaintiffs submit that the degree of care and treatments rendered by the above CHC health care providers were below the acceptable standard of care for the type and extent of medical complications and symptoms evident under the circumstances – as pertaining to the health of the fetus/JDO and as to the health and well-being of Jennifer - as set forth in the medical records discussed at length above concerning the labor and delivery by Jennifer of the parties' infant JDO.

The Plaintiffs submit that the aforementioned CHC health care providers were negligent in the following particulars:

a. Plaintiffs submit that the degree of care, and treatments rendered by the above-named CHC health care providers were below the acceptable standard of care for the CHC physicians attending to Jennifer and JDO.

b. The Plaintiffs submit that the above failures and breach of the applicable standards of care by the above CHC providers were a proximate cause of the injuries sustained by the Plaintiffs.

c. The Plaintiffs submit that above named entities' administrators' actions were below the acceptable standard of care in the hiring, training, retention and supervision of the CHC medical staff/physician(s) and nursing staff involved in the care and treatment rendered to the Plaintiffs in this matter.

d. Upon expert obstetrical physician and nursing reviews it is clear that this infant presented to the CHC Physicians, the UUMC medical and nursing staffs in excellent condition and with a fully intact neurological status -without any neurological problems or deficiencies.

e. It is also equally clear and evident in the mother's and infant's UUMC medical records that the degree of negligent care by both the CHC physicians, the UUMC Physicians, the UUMC OB residents and the UUMC labor and delivery nurses were and are a direct cause of this infant boy's extensive neurological injuries as depicted on the CT and MRI scans, and as documented concerning the trauma to the infant's skull, head and areas of his brain, as well as the other listed dire diagnoses of an obvious traumatic birth injury.

f.  Upon expert obstetrical physician and nursing reviews it is clear and evident that this fetus/infant should never have been subjected to the extreme physical trauma to the fetal/infant's head, skull and brain - caused by the involved medical providers use, misuse and overuse of the drug Pitocin [including the CHC Physician] – as the labor records reflect that there were adequate contractions throughout the labor process and during the well documented category II periods of fetal heart tracing – without the initial and continuing need for Pitocin administration .

g.  That the 'labor curve' applicable to this labor - clearly established that there was an arrest of labor due to CPD - and that the continued use of Pitocin during the progression of labor and later during the hours of ill-advised pushing efforts – did in fact cause the above significant life threatening and life altering head, skull, and brain trauma.

h.  Upon expert obstetrical physician and nursing reviews it is clear that had this delivery been expedited and concluded by a C-section delivery - in a timely manner and before any documented FHM injury to the fetus/infant – that the infant's initial normal at admission neurological status could and should have been preserved by appropriate physician and nursing care.

### III. DAMAGES

12. The Plaintiffs submit that the negligent care and treatment outlined by the above-named CHC health care providers have caused both special damages and general damages to all the individual Plaintiffs.

13. As a direct and proximate cause of the acts and omissions of the CHC Physicians referred to herein and in the UUMC medical records, the Plaintiff JDO, a minor child, has individually sustained damages, including but not limited to, permanent neurological and cognitive damages, physical damages, emotional damages, limitations in physical, cognitive and mental function, as well as pain and suffering. As a consequence of these injuries, Plaintiff JDO, a minor child, has sustained the following damages:

    a. Plaintiffs' medical expenses and associated non-medical expenses incurred in the past and that will be incurred in the future, in an amount subject to proof at trial.

    b. Loss wages and earning capacity which the Plaintiff JDO, a minor child, can reasonably be expected to have enjoyed in the future in an amount to be set forth at trial.

    c. For the Plaintiff JDO, a minor child, all past and future pain, suffering, emotional distress and the loss of the use of his body's normal degrees of function due the physical and neurological damage, as well as the associated loss of enjoyment of life in an amount to be set forth at trial.

    d. For general damages and special damages, and for such other and further relief as the Court deems just and proper.

14. As a direct and proximate cause of the acts and omissions of the CHC Physicians referred to herein and identified in the UUMC medical records, the Plaintiff parents and natural guardians and conservators have sustained the following damages:

    a. Plaintiffs' medical expenses and associated non-medical expenses incurred in the past and that will be incurred in the future, in an amount subject to proof at trial.

    b. Loss wages and earning capacity which the Plaintiff JDO, a minor child, can reasonably be expected to have enjoyed in the future in an amount to be set forth at trial.

    c. Loss wages and earning capacity which the Plaintiff Jennifer Guillen Zavala and Hugo Domingo Olivera have lost in the past and the future due to the need to care, nurture and protect JDO, a minor child and an incapacitated person, in an amount to be set forth at trial.

    e. For general damages and special damages, and for such other and further relief as the Court deems just and proper.

15. As a direct and proximate cause of the acts and omissions the CHC Physicians referred to herein and identified in the UUMC medical records, the Plaintiff Jennifer Guillen Zavala has individually sustained damages, including but not limited to physical damages, emotional damages, as well as pain and suffering. As a consequence of these injuries, Plaintiff Jennifer Guillen Zavala has sustained the following damages:

a. Plaintiffs' medical expenses and associated non-medical expenses incurred in the past and that will be incurred in the future, in an amount subject to proof at trial.

b. Loss wages and earning capacity which the Plaintiff Jennifer Guillen Zavala, can reasonably be expected to have enjoyed in the future in an amount to be set forth at trial.

c. Loss wages and earning capacity which the Plaintiff Jennifer Guillen Zavala has lost in the past and the future due to the need to care, nurture and protect JDO, a minor child and an incapacitated person, in an amount to be set forth at trial.

d. For the Plaintiff Jennifer Guillen Zavala, all past and future pain, suffering, emotional distress and the loss of the use of her body's normal degrees of function due the physical and neurological damage, as well as the associated loss of enjoyment of life in an amount to be set forth at trial.

e. For general damages and special damages, and for such other and further relief as the Court deems just and proper.

16. As a direct and proximate cause of the acts and omissions of the CHC Physicians referred to herein and identified in the UUMC medical records, the Plaintiff Hugo Domingo Olivera has individually sustained the following damages:

a. Plaintiff JDO's medical expenses and associated non-medical expenses incurred in the past and that will be incurred in the future, in an amount subject to proof at trial.

b. Loss wages and earning capacity which the Plaintiff Hugo Domingo Olivera, can reasonably be expected to have enjoyed in the future in an amount to be set forth at trial.

c. Loss wages and earning capacity which the Plaintiff Hugo Domingo Olivera has lost in the past and the future due to the need to care, nurture and protect JDO, a minor child and an incapacitated person, in an amount to be set forth at trial.

d. For general damages and special damages, and for such other and further relief as the Court deems just and proper.

WHEREFORE, Plaintiffs pray for judgment against the above-named Defendant as follows:

1. Special damages in a sum subject to proof at trial, and interest thereon pursuant to the applicable Federal statutes.

2. General damages in a sum subject to proof at trial.

3. For such other and further relief that the Court deems just and proper.

DATED this 23rd day of June 2022,

/s/Lynn C. Harris
Lynn C. Harris
Attorney At Law
3325 No. University Avenue
Suite 200
Provo, Utah 84604
801-375-9801